## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| ROBIN TAYLOR, on behalf of herself and others similarly situated,<br><br>                  Plaintiff,<br><br>v.<br><br>SUNTUITY SOLAR LIMITED LIABILITY COMPANY,<br><br>                  Defendant. | Case No.: 8:23-cv-00694-MSS-AEP |

## DEFENDANT SUNTUITY SOLAR LIMITED LIABILITY COMPANY'S MOTION TO COMPEL ARBITRATION

Defendant Suntuity Solar Limited Liability Company ("Suntuity") respectfully moves this Court pursuant to Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA") and Federal Rule of Civil Procedure 12(b)(1) for an order compelling Robin Taylor ("Plaintiff") to arbitrate the claims in her First Amended Complaint ("Complaint") (ECF No. 18). By separate motion, Suntuity moves this Court for an order staying the proceedings under Section 3 of the FAA.

### PRELIMINARY STATEMENT

Plaintiff brings this punitive class action for alleged violations of the Florida Telephone Solicitations Act ("FTSA") and the Telephone Consumer Protection Act ("TCPA"). Plaintiff's claims are premised on two purportedly unwanted telephone calls that she allegedly received from Suntuity, a company specializing in

sustainable energy solutions, including residential solar services. Plaintiff's claims that she received these telephone calls without her express written consent are meritless, as she consented to receive communications about solar services via telephone at the time she voluntarily submitted her contact information to LowerMyBills, Inc. d/b/a LowerMyBills.com ("LMB") and thereby entered into an agreement (the "Agreement"). LMB, in accordance with the Agreement, provided such data to other businesses.

Plaintiff used the LMB website to submit her personal information and solicit information and communications on February 5, 2020 at approximately 10:06 AM EST. LMB's website provided notice that Plaintiff was entering into the Agreement by explicitly stating: "By clicking the button above, you express your understanding and consent, electronically via E-sign, to the following" provisions, which include consent to be matched with and contacted by "an additional 3 providers about solar services. . . even if [she] [is] on a corporate, state or national Do Not call Registry."

By clicking the submission button, Plaintiff entered into the Agreement, which includes consent to be matched with and contacted by solar providers, the Terms of Use ("Terms"), and the explicit arbitration provision ("Arbitration Provision") contained therein.[1] Under the Arbitration Provision, Plaintiff agreed to

---

[1] The Terms, dated March 25, 2015, were in effect at the time Plaintiff visited the Website in February 2020 given that the Terms were next updated on May 2020. The Arbitration Provision in the May 2020 Terms is duplicative of the March 2015 version. Exhibit F (Comparison of Terms

resolve by final, binding arbitration, "all claims, disputes or controversies." Plaintiff further agreed that she would not file or participate in a class or representative action. The Arbitration Provision was conspicuously disclosed in capital letters. Plaintiff also waived her right to seek any remedies in this Court, including a right to a jury trial or class action, or class action arbitration, by agreeing to pursue any claims via binding, individual arbitration.[2]

Plaintiff's Complaint, alleging violations of the TCPA and FTSA, constitutes a dispute or claim under the Arbitration Provision. The Arbitration Provision does *not* require that the claim or dispute arise exclusively out of LMB's services, meaning that the provision applies to the entirety of the Agreement. The Arbitration Provision also contains a clause delegating authority to the arbitrator, including any controversy concerning whether a dispute is arbitrable. Further, Suntuity properly seeks to enforce the agreement as a third-party beneficiary, and its defenses to Plaintiff's claims are based upon the Agreement.

Accordingly, under well-settled principles of law and in furtherance of the

---

from Wayback Machine).

[2] Plaintiff alleges in her First Amended Complaint that she did not consent to receive the alleged telephone call. *See* ECF No. 18, ¶¶ 51, 64, 72. Given that Plaintiff agreed to submit claims to arbitration, this Motion need not address the legal sufficiency or merits of Plaintiff's allegations. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("When the parties' contract assigns a matter to arbitration, a court may not resolve the merits of the dispute even if the court thinks that a party's claim on the merits is frivolous.") (citations omitted). Should the Court determine that Plaintiff did not consent to the Agreement, Suntuity addresses the legal sufficiency of Plaintiff's First Amended Complaint under Federal Rule of Civil Procedure 12 by the separate motion to dismiss filed in this matter. *See* ECF No. 32.

strong federal policy favoring enforcement of valid agreements to arbitrate, Suntuity's Motion to Compel should be granted and the matter should proceed to arbitration on all of Plaintiff's claims.

## FACTUAL BACKGROUND

### I.    Plaintiff's Form Submission History on LowerMyBills.com

On February 5, 2020, Plaintiff submitted a solicitation of information request to LowerMyBills.com (the "Website"). *See* Exhibit A (Jornaya TCPA Compliance Report). Suntuity obtained a report from Lead Intelligence, Inc. d/b/a Jornaya ("Jornaya"), a neutral third-party acting as a witness to the events which took place on the Website. *Id.* Jornaya provides TCPA compliance reports for websites, which include video recordings of individual's actions on websites from the time of access until the interaction terminates.  Here, that occurred when Plaintiff pressed the "See My Results' button. *Id.*

Jornaya produced a report of Plaintiff's interaction with the Website along with a video playback showing Plaintiff's internet activity at the time, the way she progressed through the Website's series of questions and filled in her information. *See* Exhibit A at 6 (providing Visual Playback Link). Plaintiff submitted her personal information, including her full name, telephone number that she alleges was called, and address. Notably, when Plaintiff clicked the address box in which she would enter her address, her address stated Bradenton, Florida, Plaintiff's current address.

*See* Exhibit A at 6 (Visual Playback, 8:04), *see also* Exhibit B, Figure 1. However, Plaintiff then changed her address to Amissville, Virginia, another address affiliated with Plaintiff. Exhibit A at 6 (Visual Playback, 8:24), Exhibit B at Figure 2; Exhibit E (Public Record of Addresses Affiliated with Robin Taylor).

Before Plaintiff could view the results of her inquiry, she was brought to a page on a white background that stated, "Great News! Your results are ready to view." *See* Exhibit C (Screenshots of Submission Page). Underneath these words and Plaintiff's full name, telephone number, and email, a contrasting navy-blue submission button appeared with white text that states, "See my results!" *Id.* Immediately below the button, the word "Back" was written in the same font as the personal information identifier font. *Id.* Directly under the word "Back," additional text in the same font and contrasting color from the white background stated: "By clicking the button above, you express your understanding and consent, electronically via E-sign" to terms found in the four short sections that followed. *Id.*

In the relevant textual notice, the words "Terms of Use" and "Privacy Statement" appear in underlined and bright blue font, clearly signaling that the words are hyperlinks to information located on a separate page. *Id.* By clicking the blue

"Terms of Use" hyperlink, the user is taken to a separate webpage containing the full Terms.[3] *Id.* The user cannot obtain results without clicking the button.

## II.    Arbitration Provision, Class-Waiver Provision, and Delegation Clause

The first paragraph of the Terms directs the user to "take a moment to review this Terms of Use Agreement" before using the Website and provides that the "Agreement describes the terms and conditions applicable to your use of the LMB Website and the products and services provided through or in connection with the LMB Website (collectively, "Service")[.]" *See* Exhibit D (Terms).  Further, the user "must read and agree with all of the terms and conditions contained in [the] Agreement" and if the user does not agree to be bound by the terms and conditions therein, the user "may not use or access the Service" provided "through or in connection with the LMB Website." *Id.*

The Arbitration Provision, in effect in February 2020 when Plaintiff used the Website, appears in Section 2, the first capital-letters-only section of the Terms. The "**ARBITRATION**" section makes clear that the user understands and agrees that "all claims, disputes or controversies between [the user] and LMB, and parents, affiliates, subsidiaries or related companies" is subject to "final and binding arbitration." *Id.* (emphasis in original).

---

[3] The Terms hyperlink appeared at the bottom of each page on the Website throughout her experience. Thus, the Website user has access to, and notice of, the Terms of Use at all times.

The Arbitration Provision mandates individual arbitration related to all claims, disputes, or controversies between the user and LMB and related companies and includes claims based upon federal or state statutes. *Id*. The Arbitration Provision further provides that the FAA governs the interpretation and enforcement of the Provision, and that California is the state of origination and choice of law. *Id*.

By agreeing to the terms of the Arbitration Provision, Plaintiff also agreed to waive her right to assert claims against LMB via a class action or in any purported representative capacity ("Class-Waiver Provision"). Additionally, Plaintiff specifically waived her right to a jury trial. Finally, the Arbitration Provision contains a delegation clause, which provides that all claims, disputes, or controversies "shall be resolved by final and binding arbitration," not by the court, including "any controversy concerning whether a dispute is arbitrable." *Id.*

## III.    Plaintiff's First Amended Complaint

Despite her agreement to the Arbitration Provision and Class-Waiver Provision, Plaintiff seeks to bring claims on behalf of herself and a proposed class of unnamed individuals for alleged violations of the FTSA and TCPA. *See* generally ECF No. 18. Plaintiff alleges that she received an unsolicited "telephonic sales call" from Suntuity without her prior express written consent." *See* ECF No. 18, ¶¶ 22, 51, 64, 72. Because Plaintiff's Complaint is a "dispute" or "claim" between Plaintiff and "LMB and its parents, affiliates, subsidiaries, or related companies," concerning

"claims based upon any federal state or local statute[,]" it is an arbitrable issue.

## ARGUMENT

### I.    LEGAL STANDARDS

The FAA governs enforceability of arbitration agreements in federal court. *See Caley v. Gulfstream Aerospace Corp*., 428 F. 3d 1359 (11th Cir. 2005). "It is now basic hornbook law that the [FAA] . . . reflects both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Jones v. Waffle House, Inc*., 866 F.3d 1257, 1263-64 (11th Cir. 2017) (citations omitted). Consistent with that strong federal policy, "[w]hen an arbitration agreement exists, 'questions of arbitrability, when in doubt, should be resolved in favor of arbitration.'" *Costa v. Experian Info. Sols. Inc*., No. 5:23-cv-170-GAP-PRL, 2023 U.S. Dist. LEXIS 138017, at *3 (M.D. Fla. Aug. 8, 2023) (quoting *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc*., 251 F. 3d 1316, 1322 (11th Cir. 2001)). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or the allegation of waiver, delay, or a like defense to arbitrability." *Jones*, 866 F.3d at 1265; *see also Ruby-Collins, Inc. v. City of Huntsville, Ala.,* 748 F.2d 573, 576 (11th Cir. 1984) ("federal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration").

While the FAA and federal law govern the validity of arbitration agreements,

state law governs "whether an enforceable contract or agreement to arbitrate exists," including issues of interpretation and formation of such agreements. *Universal Kidney Ctr., Inc. v. Indep. Specialty Ins. Co.,* No. 6:23-cv-953-CEM-DCI, 2023 U.S. Dist. L EXIS 178477, at *3 (M.D. Fla. Oct. 3, 2023) (citing *Goodall v. Am. Express Co*., 2019 WL 4306404, at *2 (M.D. Fla. Aug. 26, 2019)). The standing federal policy strongly favoring arbitration "'is taken into consideration even in applying ordinary state law.'" *Goodall v. Am. Express Co*., 2019 WL 4306404, at *5.

This Court considers three factors when deciding whether to compel arbitration: "1) whether a valid written agreement to arbitrate exists; 2) whether an arbitrable issue exists; and 3) whether the right to arbitrate has been waived." *Terris v. Sprint Corp*., No. 8:23-cv-1033-WFJ-AAS, 2023 U.S. Dist. LEXIS 160569, at *5 (M.D. Fla. Sep. 11, 2023) (citations omitted).

The Eleventh Circuit treats a motion to compel arbitration as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See Tracfone Wireless, Inc. v. Simply Wireless, Inc.,* 229 F. Supp. 3d 1284, 1292 (S.D. Fla. 2017) (citing *McElmurray v. Consol. Gov't of Augusta- Richmond Cnty.,* 501 F.3d 1244, 1251 (11th Cir. 2007)). "[M]otions to compel arbitration are generally treated as a factual attack because they require reliance on an extrinsic document which might deprive a court of its power to adjudicate a plaintiff's claim." *Adams v. Lashify, Inc*., No. 6:23-cv-243-PGB-DCI, 2023 U.S. Dist. LEXIS 152515, at *5 (M.D. Fla. Aug. 29,

2023). Thus, the Court may consider evidence outside of the four corners of the Complaint. *Id*.

Upon a motion to compel arbitration where a valid arbitration agreement exists, courts "must stay or dismiss litigation of all claims that fall within the agreement's scope and compel arbitration according to the agreement's terms." *Ellis v. Kinedyne, LLC*, 2023 U.S. Dist. LEXIS 109485, at *3 (M.D. Fla. May 11, 2023).

## II.    THE COURT SHOULD COMPEL ARBITRATION

### A. Plaintiff Entered into a Valid Agreement to Arbitrate

Pursuant to the delegation clause, the only issue before this Court is to determine the existence of a valid agreement to arbitrate. The FAA provides that courts must compel arbitration where a party entered into an agreement to arbitrate. *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (citations omitted). Federal law provides that a written provision to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In determining whether a valid arbitration agreement exists, this Court applies "ordinary state-law principles that govern the formation of contracts." *Lashify, Inc.*, 2023 U.S. Dist. LEXIS 152515 at *6.

Florida courts "appl[y] the choice-of-law rules of the jurisdiction in which it sits." *Herman v. Seaworld Parks & Enter., Inc.,* No. 8:14-cv-3028-T-35JSS, 2016 WL 7447555, at *3 and n.2 (M.D. Fla. Aug. 26, 2016). Florida law applies to this

contract, because courts in this jurisdiction use the *lex loci contractus* theory to find that a contract "is governed by the law of the state in which the contract is made, i.e. where the last act necessary to complete the contract is done[,]" which was Florida in this case. *Colkitt v. Oncology Services Int'l, Inc.,* No. 8:19-CV-2302-T-33AEP, 2019 WL 8273661, at *3 (M.D. Fla. Dec. 18, 2019).

While Florida law applies to the contract formation in this matter, applying the Arbitration Provision's choice of law, California law, yields the same result. California law provides that, in deciding whether to compel arbitration, "a court must determine two "'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Helly v. Shutterfly Lifetouch, Inc*., No. 22-61270-CIV-DIMITROULEAS/HUNT, 2022 U.S. Dist. LEXIS 233705, at *4 (S.D. Fla. Dec. 29, 2022). A court must "determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." *Lee v. Ticketmaster L.L.C*., 817 F. App'x 393, 394 (9th Cir. 2020) (quoting *Knutson v. Sirius XM Radio, Inc*., 771 F.3d 559, 565 (9th Cir. 2014)).

Similarly, under both federal and Florida law, arbitration may proceed if: (1) a valid, written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived. *Johnson v. Whaleco, Inc*., No. 5:23-cv-403-GAP-PRL, 2023 U.S. Dist. LEXIS

184104, at *4 n.1 (M.D. Fla. Oct. 13, 2023) (citing *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla. 1999)). "The court must grant a motion to compel arbitration if it is satisfied that the parties agreed to arbitrate the claims at issue." *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010).

"In Florida, an enforceable contract requires offer, acceptance, consideration, and sufficient specification of essential terms." *Lashify, Inc.*, 2023 U.S. Dist. LEXIS 152515 at *6 (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)). "[T]he key issues in most [Florida] cases involving electronic contract formation [are] notice and manifestation of assent." *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018).

Florida recognizes two main types of internet contracts: clickwrap agreements (website users must click a box to acknowledge reading the terms and conditions as directed) and browsewrap agreements (websites provide a link to the terms and conditions and do not require the user to click an acknowledgement during the checkout process, allowing the user to "complete the transaction without visiting the page containing the terms and conditions."). *Lashify, Inc.*, 2023 U.S. Dist. LEXIS 152515 at *6-7 (citing *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021)). Under Florida law, a browsewrap agreement is enforceable "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably

prudent person on inquiry notice." *Id.* at *7-8 (citations omitted). Without the actual notice that accompanies clickwrap agreements, courts look to constructive notice of the Terms in determining whether an agreement was formed. *Id.* at *8; *See also Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, 2023 U.S. Dist. LEXIS 184104, at *7.

A party can establish the validity of a browsewrap agreement under Florida law by showing that "the website puts a reasonably prudent user on inquiry notice of the terms of the contact." *Lashify, Inc.*, 2023 U.S. Dist. LEXIS 152515 at *6-7 (quoting *Fridman*, 554 F. Supp. 3d at 1260). "Whether a reasonably prudent user is put on inquiry notice turns on the clarity and conspicuousness of the terms." *Id*. "In the context of web-based contracts, clarity and conspicuousness are a function of the design and content of the relevant interface." *Id.* Similarly, under California law, Browsewrap agreements are binding on a user of a website when the user has "'actual or constructive knowledge of a website's terms and conditions.'" *Sarcuni v. bZx DA*, No. 22-cv-618-LAB-DEB, 2023 U.S. Dist. LEXIS 52245, at *31 (S.D. Cal. Mar. 27, 2023) (quoting *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863, 200 Cal. Rptr. 3d 117 (2016)).

The Website contains an enforceable browsewrap agreement and offers terms that are disclosed through a hyperlink. The user manifests assent to those terms by

clicking the prominent "Submit" button." The Agreement, including the Arbitration Provision and Class-Waiver Provision, satisfies this standard.

### 1. The Browsewrap Agreement was Reasonably Conspicuous.

Upon entering her information to solicit LMB's information via the Website, Plaintiff encountered a final submission page that included a clear and conspicuous textual notice, conveniently located immediately below the submission button in clear font, stating: "By clicking the button above, you express your understanding and consent, electronically via E-sign to the following" terms found in the four short sections below on the same page.  Exhibit C. In this textual notice, the words "Terms of Use" appear in bright-blue front, signifying that the words are hyperlinks to information located on another page. *Id.* By clicking the blue "Terms of Use" hyperlink, the user is taken to a separate webpage containing the full Terms. It is clear and unambiguous to anyone soliciting LMB's information on this webpage that the words "button above" in the textual notice referred to the "See my results!" submission button located directly above the notice. This "See my results!" button appeared in white font and was surrounded by a navy blue rectangle. *Id.* A small empty white space separated the button from the "By clicking the button above…" textual notice. *Id.* Further, the textual notice was in the same sized font as other text on the screen. The second item under the notice contains the bright blue "Terms of Use" hyperlink.

Consistent with both Florida and California law, terms that appear in contrasting colors, are underlined, not buried at the bottom of the webpage, and stand out from the previous or subsequent sections of the webpage are sufficiently conspicuous. *Lashify, Inc*., 2023 U.S. Dist. LEXIS 152515 at *9 (finding that a similar browsewrap agreement was conspicuous even though it was the same color as the surrounding words); *see also Sellers v. JustAnswer LLC,* 73 Cal. App. 5th 444, 479, 289 Cal. Rptr. 3d 1, 28 (2021) (notice reasonably conspicuous where it is in contrasting type and clearly calls attention to relevant language). Even a brief scan of the words beneath the prominent submission button would immediately draw even the most casual users to the bright blue underlined hyperlink that is widely understood by internet users to signal a link to a different page.

In addition to the *Lashify* Court, other courts in the Eleventh Circuit have consistently found that websites like LMB's, providing notice of the applicable terms in close proximity to a checkout or signup action (in this case a submission action), create an agreement to arbitrate. *See Seminole Cty. Tax Collector v. Domo, Inc.,* No. 6:18-cv-1933-Orl-40DCI, 2019 U.S. Dist. LEXIS 68747, at *24 (M.D. Fla. Feb. 13, 2019) (finding an active hyperlink, in close proximity to a service order that led to the service agreement, to be conspicuous); *Bell v. Royal Seas Cruises, Inc*., No. 19-cv-60752, 2020 WL 5742189, at *7 (S.D. Fla. May 13, 2020), *report and recommendation adopted*, No. 19-cv-60752, 2020 WL 5639947 (S.D. Fla. Sept. 21,

2020) (hyperlinked terms "located directly above the Continue button that the user must click to proceed with using the Website" are sufficient to establish assent).

In *Lashify,* the Florida Middle District Court found that even where a small font contained the agreement's terms, the font's proximity and contrasting color to the submission button labelled "checkout" and distinguishing hyperlink features, including bold and underlining, was conspicuous. *Lashify, Inc*., at \*9. Here, the hyperlink to the Terms on the Website was even more prominent than the hyperlink used by the *Lashify* defendant, whose motion to compel arbitration was granted. Plaintiff not only received notice that clicking the button would signal assent to the terms below, but the Terms were in an underlined, bright-blue hyperlink format.

Plaintiff could not have received the requested information from LMB but for clicking the submission button. Thus, as condition of receiving the Website's services, Plaintiff clicked the submission button and manifested her assent to the Agreement, including the Arbitration Provision. *See* Exhibits C and D. Taken together, the bright-blue hyperlink to the Terms (where the user could read the full Arbitration Provision), combined with the unambiguous statement that "[b]y clicking [the] above button," Plaintiff agreed to the Terms and consented to receive communications from solar service companies, Plaintiff was clearly on constructive notice of the Arbitration Provision.

**B. The Issue of Arbitrability Has Been Delegated to the Arbitrator**

As a threshold issue, the Arbitration Provision contains a delegation clause mandating that the question of arbitrability "shall be resolved by final and binding arbitration," and "[a]ny controversy concerning whether a dispute is arbitrable shall be determined by the arbitrator and not by the court." Exhibit D. The delegation provision sends the question of arbitrability along with any "gateway" issues to the arbitrator, "such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 at 529 (recognizing that an arbitration agreement may "have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability[.]'").

The Supreme Court's long-standing rule is that a "court may not 'rule on the potential merits of the underlying' claim that is assigned by contract to an arbitrator, 'even if it appears to the court to be frivolous.'" *Id.* (citing *AT&T Technologies, Inc. v. Communications*, 475 U.S. 643, 649-650 (1986)). Thus, the arbitrator, not any court, has exclusive authority to resolve any dispute arising out of or relating to the arbitrability of this matter. *Id.* (recognizing that a court cannot "'weigh[] the merits of the grievance'" because the "'agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'") (citations omitted) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

In that regard, "[i]f a plaintiff raises a challenge to the contract as a whole and the arbitration agreement contains a delegation provision, the district court may not review his claim because it has been committed to the power of the arbitrator." *Suarez v. Uber Techs., Inc.*, No. 8:16-cv-166-T-30MAP, 2016 U.S. Dist. LEXIS 59241, at *8 (M.D. Fla. May 4, 2016), *aff'd*, 688 App'x 777, 778 (11th Cir. 2017). In this matter, the Arbitration Provision explicitly delegates the arbitrability issue to the arbitrator, not this Court.

## C. Plaintiff's Claim Falls Within the Scope of the Arbitration Provision

After determining that the parties have entered into a valid arbitration agreement, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 at 650. Where the arbitration clause is broad, as is the case here, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id*. To rebut the presumption, the party resisting arbitration (in this case, Plaintiff) must show that the arbitration agreement does not encompass the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 92 (2000). As a matter of law, "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 626 (1985) (citations omitted).

The Arbitration Provision broadly covers any dispute or claim based on state or federal law between Plaintiff and LMB or related companies and binds those companies to the agreement. *See* Exhibit D. Suntuity, belonging to the solar services class of potential callers specifically identified in the Agreement, is one of those related companies. Arbitration provisions with this same "arising out of or relating in any way" language is "routinely used . . . to secure the broadest possible arbitration coverage." *Alonso v. Google LLC*, No. 5:23-cv-91-JA-PRL, 2023 U.S. Dist. LEXIS 174416, at *5 (M.D. Fla. Sep. 28, 2023). Broad language indicating intent to arbitrate all claims arising out of the services covered by the Agreement is "interpreted broadly and cover 'all causes of action arising directly or indirectly from the business relationship evidenced by the contract.'" *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987), *aff'd*, 487 U.S. 22 (1988)).

Here, Plaintiff alleges that she received unsolicited "telephonic sales calls" to her cellular telephone number (which she provided to LMB) from Suntuity about its solar services without her prior written consent. *See* ECF No. 18, ¶¶ 22, 51. During Plaintiff's February 8, 2023 call with Suntuity, she agreed to have a Suntuity technician come to her home. *See* ECF No. 32 (Suntuity's Motion to Dismiss). Thus, the alleged communication between Plaintiff and Suntuity relates to the solar

services referenced in the Agreement to which Plaintiff assented. Accordingly, Plaintiff's Amended Complaint is a "dispute" or "claim" that "aris[es] out of or relat[es]" to a company related to LMB, Suntuity, and Plaintiff's claims are arbitrable.

### D. Suntuity has Not Waived its Right to Arbitrate

The Eleventh Circuit evaluates waivers of arbitration rights "under the same standard set by the applicable state law governing other contract waiver issues." *Lashify*, 2023 U.S. Dist. LEXIS 152515; *see also Ellis*, 2023 U.S. Dist. LEXIS 109485, at *4. A defendant does not waive its right to arbitrate where it has not yet engaged in extensive discovery. *Id.* Here, Suntuity has not sought discovery and has only submitted a Joint Case Management Report and motion to dismiss the Amended Complaint, which was filed less than five months ago. *Id.* Under the circumstances, Suntuity has not waived its right to arbitrate.

### E. Suntuity Is Permitted to Compel Arbitration Under the Theories of Third-Party Beneficiary and Equitable Estoppel

Should this Court find Plaintiff demonstrated assent to the Terms by clicking the Website's submission button, no other issue, including Suntuity's standing to move to compel, shall be before this Court. Whether Suntuity may enforce the Agreement's Arbitration Provision is an issue exclusively to be determined by the arbitrator, not the court, under the delegation provision. *See* Exhibit D. Further,

based on the language of the delegation provision, the validity of the provision itself is not before this Court, and may only be determined by an arbitrator. *Id.*

Nevertheless, to the extent this Court seeks clarity on this issue, Suntuity properly seeks to enforce the Arbitration Provision as a third-party beneficiary and under equitable estoppel principles. "A non-signatory may compel signatory to arbitration" pursuant to both Florida law and the FAA under the principles of third-party beneficiary and equitable estoppel. *Heller v. Blue Aero., LLC*, 112 So. 3d 635, 637 (Fla. Dist. Ct. App. 2013); 9 U.S.C. § 4; *see also Universal Kidney Ctr., Inc. v. Indep. Specialty Ins.* Co., No. 6:23-cv-953-CEM-DCI, 2023 U.S. Dist. LEXIS 178477, at *8 (M.D. Fla. Oct. 3, 2023) (federal courts place arbitration agreements "upon the same footing as other contracts," applying "traditional principles of state law" such as estoppel and third-party beneficiary theories) (citations omitted).

*First*, Florida law recognizes that a third-party beneficiary nonsignatory is permitted to enforce an agreement. A nonsignatory is a third-party beneficiary of a contract where "the contract clearly expresses an intent to primarily and directly benefit the third party or a class of persons to which that party belongs.'" *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 983 (11th Cir. 2005) (quoting *Morgan Stanley DW Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. 4th DCA 2004)). "Florida looks to the 'nature or terms of a contract' to find the parties' clear or manifest intent that it 'be for the benefit of a third party.'" *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522,

524 (Fla. 4th DCA 2002) (citations omitted); *see also Capua v. Air Europa Lineas Aereas S.A., Inc.,* No. 20-CV-61438-RAR, 2021 U.S. Dist. LEXIS 47759, at *12 (S.D. Fla. Mar. 15, 2021) ("Florida law holds that 'the language used in a contract is the best evidence of the intent and meaning of the parties.'") (citations omitted).

The Agreement explicitly states that it "describes the terms and conditions applicable to [Plaintiff's] use of the LMB Website and the products and services provided *through or in connection with the LMB Website.*" *See* Exhibit D (emphasis added). This language does not exclude services provided by other companies *through* the Website, including solar service providers like Suntuity, from which Plaintiff explicitly consented to receive communication. Further, the Agreement reflects the intent of the parties to arbitrate all claims and does not state that they must arise out of the services provided by LMB. *Id.*

The Agreement expressly grants permission for solar services providers to contact Plaintiff. *See* Exhibit C. Therefore, Suntuity, a solar service provider, is a member of the "class of persons" that the Agreement clearly expresses an intent to primarily and directly benefit. *See Bochese*, 405 F.3d 964 at 983. This specific language confers a contractual benefit upon Suntuity and, by virtue of Plaintiff's submission of her information on the Website and request to be contacted, both companies were able to contact her regarding services within their industries.

22

In further support of Suntuity's motion, the Agreement's "Release" provision also states that the user (here, Plaintiff) agrees to release "LMB and its affiliates, service providers, clients, vendors, and contractors," including their respective agents or related persons or entities, from "any and all manner of rights, claims, complaints, demands, causes of action . . . of any nature whatsoever, whether known or unknown, which now or hereafter arise from, relate to, or are connected with your use of the service." *See* Exhibit D at Section 13. "Service" is specifically defined in the Agreement as "products and services provided through or in connection with the LMB Website." *Id.* Importantly, the Arbitration Provision applies to Plaintiff's claims against LMB, and also explicitly binds nonsignatories, including "other related companies." *Id.* A plain reading of the Agreement shows that there is a class of companies, like Suntuity, which are not under the same parent corporation, are not affiliates or subsidiaries, *but* do have a relation to LMB. Not only did the Agreement confer the intended referral benefit to Suntuity, but Suntuity received a tangible benefit because it was able to schedule an appointment with Plaintiff after she voluntarily engaged with a Suntuity representative during a telephone call.

*Second*, under Florida's equitable estoppel doctrine, "a defendant who is a non-signatory to an agreement containing an arbitration clause can force arbitration of a signatory's claims when 'the signatory . . . must rely on the terms of the written agreement in asserting its claims against the nonsignatory[.]" *Torres v. Starbucks*

*Corp.*, No. 8:20-cv-1311-CEH-TGW, 2021 U.S. Dist. LEXIS 47821, at *12 (M.D. Fla. Mar. 15, 2021) (citations omitted). Florida courts interpret contract language such as "arising out of or relating to" to encompass "claims between the contracting parties that require reference to or construction of some portion of the contract." *Id.* (citing *Seifert v. U.S. Home Co*rp., 750 So. 2d 633, 637-38 (Fla. 1999)). Here, the Agreement contains no such limiting language.

In this case, Suntuity is a member of an identified category of third parties who are subject to the Arbitration Provision: solar services providers. If Suntuity brought claims against Plaintiff arising out of the Agreement, Suntuity would be subject to the Arbitration Provision because its relationship to Plaintiff was established therein. Plaintiff should be bound that same way. LMB's Website and the Agreement are the source of Suntuity's defenses, including that Plaintiff consented to receive communication from Suntuity. Thus, "the defenses of the non-signatory defendant[ ] are based on the same set of operative facts" that Plaintiff may allege against the signatory, LMB. *Greene v. Johnson*, 276 So. 3d 527, 531 (Fla. Dist. Ct. App. 2019). Both the nonsignatory and signatories in this case can base rights and defenses on the Arbitration Provision, and those claims and defenses relate to substantially interdependent conduct of both the signatory and nonsignatory. *See Beck Auto Sales, Inc. v. Asbury Jax Ford, LLC*, 249 So. 3d 765,

767 (Fla. Dist. Ct. App. 2018).  Plaintiff's claims, thus, bear a significant relationship to the agreement.

Plaintiff alleges that Suntuity is liable under the FTSA and TCPA for calls initiated by its lead generator, non-party SMT. *See* ECF No. 32 (Suntuity's Motion to Dismiss) at 5-6.  SMT contacted Plaintiff based upon information she provided to LMB, which was provided to SMT. Denying Suntuity's status as a third-party beneficiary would, therefore, effectively prohibit Suntuity from enforcing its *own* defenses and its *own* rights contained in the same Agreement under which Plaintiff permitted LMB to relay her contact information to SMT. Thus, Suntuity and Plaintiff are bound under the Agreement, and Suntuity may enforce the Agreement, including the Arbitration Provision, against Plaintiff.

## CONCLUSION

For the foregoing reasons, the Court should grant Suntuity's motion to compel arbitration and grant such further relief as it deems just and proper.

DATED: November 14, 2023          Respectfully submitted,

SPIRO HARRISON & NELSON

By: */s/ Michelle C. Clerkin*
    Michelle C. Clerkin
    Florida Bar No. 1045076
    mclerkin@shnlegal.com
    1111 Lincoln Road, Suite 500
    Miami Beach, Florida 33139
    Telephone: (786) 841-1181

Adlai J.J. Small (*pro hac vice*)
asmall@shnlegal.com
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Telephone: (973) 232-0892
*Counsel for Defendant Suntuity Solar*
*Limited Liability Company*

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Suntuity met and conferred with counsel for Plaintiff regarding this motion. The parties were unable to reach an agreement on the resolution of the issues in this motion.

/s/ Michelle C. Clerkin
Michelle C. Clerkin

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that on November 14, 2023, I electronically filed the

foregoing with the Clerk of Court by using CM/ECF, which sent automatic

notification of such filing to all counsel of record.

By: <ins>/s/ *Michelle C. Clerkin*</ins>
Michelle C. Clerkin